IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NORTH CAROLINA (ASHEVILLE)

| | |
|---|---|
| WILLIAM ZIEGLER and VICKI ZIEGLER,<br><br>Plaintiffs,<br><br>v.<br><br>POLARIS INDUSTRIES, INC., a Minnesota Corporation<br><br>Defendants. | CASE NO. 1:22-MC-00023-MR-WCM<br><br>CHIEF JUDGE MARTIN REIDINGER<br><br>MAGISTRATE JUDGE W. CARLETON METCALF |

FILED
Asheville
Oct 04 2022
U.S. District Court
Western District of N.C.

## PLAINTIFFS WILLIAM ZIEGLER and VICKI ZIEGLER'S MOTION TO TRANSFER SUBPOENA-RELATED MOTION TO ISSUING COURT

Now comes the Plaintiffs, William and Vicki Ziegler, by and through their attorney in this regard, Thomas M. Paris, and for their Motion to Transfer Subpoena-Related Motion to Issuing Court, states as follows:

### I. INTRODUCTION

Polaris issued a subpoena to Mission Hospital for the medical records of non-party Eric Kipp. Kipp moved to quash. Polaris has responded, and Kipp replied. William and Vicki Ziegler have a substantial interest in the outcome of the motion and bring this motion to protect their interests.

Federal Rules of Civil Procedure 45 (f) provides as follows:

> TRANSFERRING A SUBPOENA-RELATED MOTION. When the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances. Then, if the attorney for a person subject to a subpoena is authorized to practice in the court where the motion was made, the attorney may file papers and appear on the motion as an

1

officer of the issuing court. To enforce its order, the issuing court
may transfer the order to the court where the motion was made.

William Ziegler was rendered an incomplete quadriplegic as a result of the underlying occurrence. His medical bills exceed $1.3 million. Vicki Ziegler has a substantial loss of consortium claim. Motion practice before the trial judge including Motions in Limine and *Daubert* motions is expected, all of which will impact case strategy and the admissible of evidence. Whether sufficient admissible evidence exists to prove Kipp was impaired, how that impacts Plaintiffs' product liability case, and whether the jury should consider potentially prejudicial evidence all will need to be decided by the trial judge. Given the nature of this case, Plaintiffs ask this court to exercise its discretion and transfer the pending motion to the Western District of Michigan, where Judge Beckering will be deciding many evidentiary issues.

## II. ARGUMENT

1. **Ziegler's blood analysis explicitly states it "should not be used for non-medical purposes". If Mission Hospital drew and analyzed Kipp's blood for the presence of alcohol, it very likely provides the same prohibition - - a fact hidden behind Polaris' redaction and incomplete exhibit B to its response brief.**

Polaris asks the court to consider a redacted toxicology screen of William Ziegler, arguing or inferring that Kipp's blood alcohol concentration, like Ziegler's, should come into evidence. Polaris, however, does not provide the court with the most important evidence regarding Zeigler's BAC result: Mission Hospital's statement that Ziegler's BAC should not be used for non-medical purposes. Specifically, footnote 16 advises:

> Ethanol Level: Positive results have not been verified by a second
> confirmatory procedure. Unconfirmed results should not be used for
> non-medical purposes.

Attached hereto as Exhibit A is the complete document with only personal identifying information redacted.

2

Polaris does not provide this court with any indication that it has consulted with an expert who can satisfy admissibility standards and use a Mission Hospital BAC for forensic purposes. No test result would be admissible without an expert. A witness will need to explain to the trier of fact, and should now to a court, why an unconfirmed BAC should be used for forensic purposes despite the fact that the test result indicates that is not a proper purpose.

Polaris also redacts the urine drug screen information which directly states, "unconfirmed positive results from the Mission urine drug screen may be useful for medical purposes, but do not meet forensic standards." Mr. Ziegler's urine toxicology screen was negative for every substance tested. Mr. Kipp's may or may not be. However, to the extent that the urine drug screen is positive for some substance, the results, like the BAC, "may be useful for medical purposes, but do not meet forensic standards." Polaris has no medical reason to need Kipp's private health information.

2. **North Caroline State Trooper Crawford explicitly told Polaris' counsel that Ziegler's BAC, as reported by Mission Hospital, is not the equivalent of a forensic BAC.**

Polaris marked as Exhibit K to Trooper Crawford's deposition both pages of the Mission Hospital ethanol screening. The following questions and answers followed the presentation of Exhibit K to Trooper Crawford.

> Q. Have you seen a toxicology report like this before?
> A. I have.
> Q. I would have expected in your line of work this is a document you would be familiar with. The ethanol level for Mr. Ziegler for a collection date and time of November 28, 2019 at 2:22 Eastern was .215. Do you see that?
> A. Yes, sir.
> Q. That is a high level of intoxication. Right, sir?
> A. Actually, the blood alcohol level, how they -- how they -- how they test for it in the hospital is different than how we test for it at our state lab. That -- that is -- there is actually a conversion you have to do with that to get -- that's really not a .21.
> Q. I see.
> A. See what I'm saying?

3

> Q. I see.
> A. It's a conversion that you would have to have -- the guy that teaches our forensic alcohol branch, the guy that's over our forensic and alcohol branch in North Carolina, he does that conversion usually for us in court when we get blood alcohol from a hospital.
> Q. From your experience, do you have a rough understanding of what the .215 hospital blood alcohol would convert to for law enforcement purposes?
> A. I do not. I don't. I -- you would have to have that conversion to even tell you what that would be.

Transcript at 91.

Attached hereto and incorporated herein by reference as Exhibit B is Trooper Crawford's deposition, along with Exhibit K.

Despite the fact that it knows that Mission Hospital warns that the BAC should not be used for nonmedical purposes, and despite the fact that Trooper Crawford explained that a hospital .215 BAC is not the equivalent of a .215 for forensic purposes, Polaris asks this court to rely upon Ziegler's Mission Hospital record in support of its unsupported erroneous argument that a hospital BAC of Eric Kipp would be reliable, admissible, or something other than an unconfirmed result that should not be used for nonmedical purposes.

### 3. Trooper Crawford investigated the crash and could not form an opinion that Kipp was impaired.

Though DWI is in the top three reasons for fatalities and death, that he investigates, (speed and lack of seat belts being the other two), Trooper Crawford, after investigating the crash, could not arrive at an opinion that Kipp was impaired. His investigation included observing and measuring the crash scene, seeing Ziegler and Kipp in ambulances and arriving at an understanding that they had very serious injuries, interviewing first responders, making multiple attempts to interview a witness, interviewing Kipp after he was discharged from the hospital and having the ability to ask a magistrate judge to authorize the production of medical records if he had probable

cause to believe Kipp was impaired. On multiple occasions during his deposition Trooper Crawford explained to Polaris' counsel that he could not formulate an opinion as to impairment. Having failed to secure the opinion of a state trooper, Polaris now seeks to, presumably, bring in an expert to use privileged medical information for reason it explicitly states is contrary to its purpose. If Polaris is going to violate privilege and misuse medical evidence it should fully explain to the trial judge how this will lead to admissible evidence. Its failure to do so speaks louder than what it argues to the court.

4. **At least four explanations for the crash exists that may provide Polaris a defense that do not involve alcohol.**

Polaris argues that obtaining the medical records of Kipp is important so that a jury might properly apportion damages. Plaintiffs case against Polaris, has nothing to do with <u>why</u> the UTV went off the road. Plaintiffs' case focuses on the failure of the rollcage, regardless of why it sustained an impact. There is no dispute that Kipp was driving the UTV when it went off the road. Why the vehicle went off the road, Polaris' focus, is explainable without alcohol for one or more of the following reasons.

1. North Carolina law, and Polaris' instructions, prohibit the UTV from being driven on paved roads. Trooper Crawford ticketed Kipp for driving the UTV on the roadway, a ticket which Kipp apparently paid. Accordingly, Polaris will have no difficulty telling the jury that this vehicle should not have been driven on a road, and Kipp had admitted as much by paying the ticket that he was issued.
2. The off-road knobby tires, once on the soft shoulder, pulled the vehicle to the right (which is to be expected) and down the embankment. Trooper Crawford explained this repeatedly See transcript at pages 109, 115, 122. Knobby tires designed for off-road/trail riding react differently on paved surfaces. Polaris explicitly warns against driving on paved roads. No doubt Polaris will have ample opportunity to blame Kipp for driving the Polaris in a manner which, according to its warnings, was not intended.
3. William Ziegler testified that Kipp intentionally moved to the right to avoid an oncoming vehicle. Presumably, Kipp will too. Everyone agrees that Dark Ridge Road a/k/a State Road 1705 is narrow and curvy. Kipp's action in moving to the right, combined with the knobby tires, caused the vehicle to grip the

5

unpaved area and pull the vehicle to the creek. Polaris will have no difficulty explaining, again, why its warnings should be heeded and the UTV not driven on paved roads, particularly narrow ones where oncoming traffic is expected.
4. Paramedic Schwinler described the weather as rainy before and at the time of the crash, testimony confirmed by Ziegler. Trooper Crawford testified the temperature was fifteen degrees. Transcript at 65. Everyone agrees the UTV's departure from the roadway was at a point of a curve in the road. Accordingly, a slippery, perhaps icy road, not an impaired driver may explain the crash. Trooper Crawford, and no doubt a Polaris witness, will explain how knobby tires do not perform well on slick, paved surfaces.

Accordingly, Polaris will have no difficulty supporting an argument that Kipp should bear some responsibility for the crash. In fact, they have many explanations as to why the vehicle left the roadway.

**5. Eric Kipp is a Michigan citizen and entitled to have his rights adjudicated pursuant to Michigan law, the venue where Plaintiff has properly brought this suit.**

Whether Michigan or North Carolina law control various issues of liability, and admissibility, Eric Kipp is presently a Michigan resident and presently exercising his rights to protect his medical records. Plaintiffs believe that, under those circumstances, Michigan law should control and the Michigan trial judge in the best position to provide a correct analysis of Mr. Kipp's medical privileges. Choice of law in this case may become critical for many reasons. Choosing North Carolina or Michigan law may have much larger ramifications for both parties. The trial judge should make that call after a full consideration of the case.

**6. Medical privacy rights are of greater concern now than they ever have been. The court should consider the broad ramifications of Polaris' request.**

Eric Kipp may be only the first of many subpoenas for medical records that Polaris issues. Perhaps it will seek the medical records of the oncoming driver who may have been impaired, distracted, sleepy, or have any number of medical conditions. Perhaps that driver was hurriedly seeking medical attention at that moment. Will those medical records likewise be discoverable? How about witnesses such as Dustin Hoyle who entered the frigid creek to save the lives of

6

William Ziegler and Eric Kipp? If his testimony does not square with Polaris' version of the facts, will Polaris seek his medical records and try to prove that he was impaired through drug or alcohol use at that time? Habitually? What about volunteer first responders who were called to the scene of the crash at 1:00 a.m. on Thanksgiving morning? Polaris suggests that everyone on that day may have had some alcohol to drink. Is Polaris entitled to the medical records and/or testimony of those individuals based upon its current theory? If Polaris disagrees with the opinions of an expert, judge or witness, will it be able to obtain medical records that may prove that the vision, mental acuity or life circumstances establish some level of impairment or incompetency?

7. **Eric Kipp has brought his peace. He should have it.**

Eric Kipp paid his policy limits to be dismissed form this case. Polaris moved to vacate the dismissal. Judge Beckering denied that motion after it was fully briefed. She is in a better position to understand the details and intricacies of this case. It would be appropriate for her to rule upon the pending motion. Her ruling, attached hereto as Exhibit C, anticipates this issue.

8. **Whether Kipp was impaired by alcohol, sleepy, distracted or otherwise negligent and the proximate cause of the UTV departing from the roadway, fault can be apportioned by a jury without invading privilege.**

Polaris seeks to "pile on" with a highly prejudicial alcohol defense. It has undisputed facts that a jury will consider, namely illegally driving an off-road vehicle on a state highway, disregarding Polaris' warnings, being at the steering wheel when the vehicle departed from the roadway and went into the creek. There are sufficient facts to apportion liability without invading medical privilege, or prejudicing a jury with records intended for doctors treating an injured patient, not forensic experts and jurors. Accordingly, Polaris' argument that a jury needs privileged medical records to properly apportion liability is inaccurate and may lead to a prejudicial admission of records, something which Judge Beckering is in a better position to decide.

7

### III. CONCLUSION

Plaintiffs bring a products liability case against Polaris for the crashworthiness of its rollcage. The rollcage was not weakened by Kipp's consumption of alcohol - - assuming he did consume alcohol. Kipp admitted his responsibility to illegally driving an off-road vehicle on a roadway, a fact which is undisputed and can serve as the basis for Polaris' position that Kipp is responsible for some or all of Ziegler's damages. Polaris has many other theories that it can pursue in seeking apportionment. If Polaris is going to be allowed to invade medical privilege here, and perhaps beyond, to obtain potentially prejudicial and inflammatory evidence, it should be the trial judge in Michigan who allows this extraordinary request. Plaintiffs believe that consistent rulings by the trial judge will serve the interests of justice, which Polaris claims that it wants, and therefore request the Motion to Quash the Mission Hospital Subpoena be transferred to Judge Beckering for her consideration and disposition.

Dated: October 4, 2022

Respectfully Submitted By:

/s/ *Thomas M. Paris*
Thomas M. Paris
*Counsel for Plaintiffs William Ziegler and Vicki Ziegler*

Thomas M. Paris
55 W. Monroe, Suite 3330
Chicago, IL 60603
312-759-1600
tp@tomparislaw.com